# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
August 8, 2017

*In re* WOODS, Minors.

No. 335145 and 335146
Ogemaw Circuit Court
Family Division
LC No. 00-011345-NA

Before: MARKEY, P.J., and RONAYNE KRAUSE and BOONSTRA, JJ.

PER CURIAM.

In these consolidated cases,[1] respondents appeal by right the trial court's order terminating their parental rights to two minor children under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continues to exist) and (g) (failure to provide proper care or custody). In Docket No. 335146, respondent-father challenges the trial court's determination that at least one of the statutory grounds set forth in MCL 712A.19b(3) was established by clear and convincing evidence. Additionally, respondent-father claims that the trial court erred by accepting his plea to the allegations in the petition during the adjudication phase of the proceedings. In both docket numbers, respondents challenge the trial court's determination that terminating parental rights was in the children's best interests. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondents are the parents of three children: NW and twins AW1 and AW2. Respondent-mother is the mother of an additional child, JC. The termination of respondents' parental rights to AW1 and AW2 are the subject of this appeal.

The trial court acquired jurisdiction over respondent-mother's four children in 2008 after Children's Protective Services (CPS) substantiated a case against her. She pleaded to the allegations in the petition that she was homeless, had an alcohol addiction, was in a domestically violent relationship with her boyfriend (who was not the father of any of the children), and needed to improve her parenting skills. She had placed the children with a friend who had power

---

[1] *In re Wood Minors*, unpublished order of the Court of Appeals, entered October 21, 2016 (Docket Nos. 335145, 335146).

of attorney over them. This friend could no longer care for the children, who were undisciplined and unsocialized. Respondent-father's whereabouts were unknown at the time of the preliminary hearing, but he was granted supervised parenting time, which was suspended until he completed a psychological evaluation or counseling. The court ordered respondents to comply with and benefit from a case service plan. The children were returned to respondent-mother's care under petitioner's supervision.

The children were removed from respondent-mother's care in 2009 because of continued neglect and her incarceration. The trial court found that respondent-father had not had contact with the children for approximately five years and that the children lacked adequate support and care. The trial court released jurisdiction of the children and they were returned to respondent-mother's custody and care on August 25, 2009 after she participated in several months of services. At some point, respondents and the children moved to New York and later returned to Michigan.

In 2014, CPS determined that respondent-mother had physically abused JC and that JC had missed an excessive amount of school. Further, it was determined that respondents had left New York while under the jurisdiction of a New York court in violation of that court's order and while NW had an open juvenile probation case. Respondents had also violated a New York court order to refrain from using illegal substances, to assure that the children attended school regularly, and to provide safe and adequate housing, comply with mental health services for NW, and refrain from becoming involved in physical altercations with the children. Respondent-mother tested positive for hydrocodone on July 30, August 1, and August 26, 2014, although she had been prescribed this medication so the value of this is suspect. Respondent-father tested positive for hydrocodone on August 1, 2014; he did not have a prescription. Respondents had not acquired housing since returning to Michigan and they failed to follow through with an appointment with Catholic Human Services for substance abuse treatment.

On September 9, 2014, petitioner filed a petition requesting that the court assume jurisdiction over all four children because of respondents' substance abuse, educational and medical neglect of all children, inadequate housing, and respondent-mother's physical abuse of JC. Petitioner did not seek to remove the children from the home. The referee held a preliminary hearing and an adjudication hearing on September 16, 2014. At the outset of the hearing, the referee noted that both respondents had signed written waivers indicating that they were waiving their right to an attorney. The referee inquired whether both respondents were "waiving an attorney at this time" and whether they were making such a waiver of their own free will. To both inquiries, both respondents responded "yes." Both respondents then specifically admitted to various allegations in the petition and denied others. For example, respondent-mother admitted to leaving the jurisdiction of New York, and to testing positive for hydrocodone on three drug screens, but denied the allegations that her children lacked mental health services and psychiatric medications. Respondent-father admitted to failing to comply with court-ordered services in New York, to having convictions for child endangerment in New York, to having a history with CPS in both New York and Michigan, and to testing positive for hydrocodone on a random drug screen, but denied purchasing prescription medications for his personal use for which he did not have a prescription, denied deficient housing, and also denied that his children lacked mental health services and psychiatric medications. The referee advised both respondents that by their admissions they were giving up their rights attendant to an adjudication trial. Both

respondents stated that they understood those rights, understood that they had were giving up those rights, and understood that the Court would therefore have jurisdiction over the children, and again indicated that they were making their admissions of their own free will. Following respondents' pleas of admission, the trial court authorized the petition and took jurisdiction over the children.

Respondents were ordered to comply with and benefit from their case treatment plan while the children remained in their custody and care. Respondent-mother was psychologically evaluated by Dr. Wayne Simmons, who determined that she had average intelligence and had dropped out of school after the 10th grade. Respondent-mother reported that she used hydrocodone for back and hip pain because of diagnosed myofascial difficulty, degenerative disc disorder and pinched sciatica. She also used Flexeril as a muscle relaxer, Xanax for anxiety, and Effexor, an antidepressant. Dr. Simmons' recommendations included parenting guidance sessions with respondent-father and careful monitoring for potential prescription medication abuse.

In a 2014 substance abuse assessment, respondent-mother reported abusing alcohol from ages 12 to 28 and being arrested ten times for domestic assault and disorderly conduct. She stopped drinking before she entered rehabilitation and outpatient therapy in May 2008. She reported no legal problems since she had stopped drinking. She disclosed that for more than five years she had been prescribed hydrocodone and Flexeril daily for chronic back pain and took the medication as prescribed. She also used Xanax. Diagnoses included alcohol dependence and opioid and sedative abuse, reported anxiety and chronic back pain. Respondent-mother did not believe that she had a substance abuse problem. Recommendations included mental health counseling for anxiety and periodic drug screening to confirm abstinence, and further outpatient substance abuse treatment if there were any indications of substance misuse.

Respondent-father was also evaluated by Dr. Simmons. Respondent-father was receiving Social Security Disability Insurance (SSDI) benefits because of a birth defect involving his right leg and a learning difficulty. He had completed 10th grade and had problems with the law as a juvenile. Respondent-father denied any recent difficulty with alcohol but stated that he had been arrested for unlawful driving. Respondent-father acknowledged having some challenges with authority and was prescribed Zoloft for anger. He reported mood swings and a past diagnosis of bipolar disorder with oppositional tendencies. Respondent-father said that he had been prescribed hydrocodone for pain in his leg and lower back. Dr. Simmons was concerned that respondent-father was allowing respondent-mother to use his narcotics because his drug screens were below therapeutic levels. He diagnosed respondent-father with attention deficit/hyperactivity disorder (ADHD) and low average verbal intellectual function, and recommended that respondent-father be referred a physician who treated children and adolescents for ADHD as well as other behavioral and emotional disorders. Dr. Simmons also recommended ongoing outpatient psychotherapy, parental guidance to more effectively understand and implement behavioral boundaries with children, and cooperation with respondent-mother.

Respondent-father attended a substance abuse assessment with Catholic Human Services on February 3, 2016. The recommendations included inpatient detox but it was noted that

respondent-father was willing to detox with an outpatient provider and engage in physical therapy. He was to attend individual and group outpatient sessions and participate in a 12-step support group to ensure his sobriety.

Dr. Simmons also evaluated the four children. The twins were diagnosed with ADHD and low average verbal intellectual function with moderate to severe social "misfittedness." NW was diagnosed with ADHD combined with variety oppositional defiant disorder. JC was diagnosed with oppositional defiant disorder, low average verbal intellectual function, moderate to severe psychosocial stressors of truancy, and lack of educational compliance. Dr. Simmons recommended individual psychotherapy for AW2, NW and JC and social skills training for AW1, as well as a medication assessment and monitoring for the children.

The trial court conducted several review hearings in which treatment providers reported minimal progress by respondents in complying with their case treatment plans. On May 28, 2015, the court granted petitioner's request to remove the children from the home, concluding that the children were at risk because respondents had failed to comply with their case treatment plans. Respondent-mother had missed mental health appointments. Respondents had not made active efforts to take AW2, NW or JC to their mental health appointments despite being offered transportation assistance. Respondent-mother stated that she was overwhelmed and confused by all of the appointments the caseworkers required, even though she was unemployed. The children were often sent home from school for poor hygiene or bathed at school. The caseworker visited the home on the day of the hearing and noted an overpowering odor. JC told the caseworker that she did not want to go to school because she did not have any clean clothes. NW and JC's juvenile probation officer also testified that the home had an unbearable smell and that the children had poor personal hygiene. Respondent-mother testified that AW1 went to school clean but had problems keeping herself clean because of wetting herself and that her school never communicated that there was a hygiene problem. Respondent-mother blamed NW's hygiene issues on "bad feet" and denied that JC lacked clean clothes.

The caseworker reported that respondents had failed to follow through with the twins' forensic interviews that were part of a criminal investigation of possible sexual abuse by a cousin. Respondents had not adequately allocated their household income to necessary expenses. The family was $1,900 behind in rent/property damage obligations, and was at a risk of eviction. The children were initially placed with their maternal grandmother. Respondents were granted supervised visitation. NW and JC were placed in separate foster homes on June 26, 2015. The twins were placed together in a foster home on July 7, 2015.

The twins' lawyer guardian ad litem (LGAL) reported a remarkable positive change in their behavior during a July 31, 2015 visit to the new foster home. The LGAL reported that a September 30, 2015 visit with respondents and all of the children was loud and chaotic.

At a March 28, 2016 review and permanency planning hearing, the court found that respondents were still not making adequate progress and directed petitioner to file a termination petition. Respondent-mother had obtained employment and housing, but continued to test positive for hydrocodone at higher than therapeutic levels, as well as for the prescription medication Tramadol, for which she did not have a prescription. Based on the caseworker's

testimony, the court concluded that respondent-father had had unsupervised contact with NW and had asked him to bring marijuana cookies to supervised parenting time. NW had begun trading marijuana and cigarettes at school and faced a possible 180-day suspension. Respondent-mother claimed that she was unaware of the unsupervised contact between respondent-father and NW. JC and AW1 were both transitioning to residential treatment programs. The court followed petitioner's and the LGAL's recommendations to change the case goals to guardianship/adoption for NW and the twins because their respective foster parents were willing to provide them with necessary permanency.[2]

On June 17, 2016, petitioner filed a supplemental petition to terminate respondents' parental rights to the twins and NW under MCL 712A.19(b)(*ii*),(c)(*i*), (*ii*), (g) and (j.). At the termination hearing, Bridget Goss, the assigned foster care worker since July 7, 2015, testified regarding petitioner's family reunification efforts. Substance abuse, inadequate housing, finance mismanagement, and failing to following through with prior services were the major issues identified. It was noted that respondents' history with CPS beginning in 1998 included one complaint in Alabama against respondent-mother, 35 complaints in Michigan, and 11 complaints in New York.

Goss testified that from September 2014 until May 15, 2015, respondents had participated in home-based services with Northern Family Intervention and Families First in an effort to prevent the children from being removed from the home. Respondents received food and medical assistance. Respondents had also participated in Wraparound, a program designed to address the entire family's needs to keep the children in the home.

Goss stated that after the children were removed from the home on May 28, 2015, respondents were provided with supervised parenting time beginning in July 2015. Respondents were given transportation assistance, including gas cards and bus passes, so that they could participate in services. Respondents completed a six-week trauma-focused parenting class. Initially, it appeared that they had benefited from the classes as evidenced by their appropriate engagement with the children during supervised parenting time, but they reverted to a pattern of being disengaged and not following through with services. Ninety percent of the supervised parenting sessions (including those just before the termination hearing) required intervention by the supervisor because of respondents' inappropriate conduct. Respondent-mother would tell the children not to listen to the foster parent, whom respondent-mother called "stupid." Respondents missed 21 of the 22 monthly psychiatric appointments for the children's medication reviews despite transportation assistance. Respondents did not return calls from the Wraparound program caseworker. Goss testified that respondent-mother had admitted to violating the supervised parenting time court order by having unsupervised contact with NW and JC.

Goss testified that respondent-mother did not follow any of the recommendations resulting from her psychological evaluation, including benefiting from a parenting program and

---

[2] JC was not included in permanency planning because she refused to participate in services and would soon turn 18 years of age.

careful monitoring of prescribed medications. Respondent-mother did not participate in recommended physical therapy to help with pain management and reduce the need for prescription medication. In January 2016, respondent-mother completed a substance abuse assessment and completed eight weeks of substance abuse counseling. However, she had not achieved emotional stability because she had not adequately addressed her substance abuse issues. Since July 10, 2015, respondent-mother had passed only six of 31 drug screens and had not attended Alcoholics or Narcotics Anonymous. She tested positive for prescriptive drugs above therapeutic limits, illegal substances, and drugs for which she had no prescription. She refused to provide a drug screen on June 29, 2016. Respondent-mother knew at the time she refused the screen that a termination petition had been filed. She attended four of 10 weekly group therapy sessions. She cancelled some of the sessions because of transportation concerns even though transportation arrangements had been made, and failed to show up for other sessions.

Goss testified that respondent-father similarly failed to comply with and benefit from his treatment plan. He failed to follow through with a September 2014 referral for substance abuse treatment services. He eventually completed an assessment in February 2016 but did not follow through with recommended physical therapy and individual and group therapy. He passed only three of 30 drug screens, including refusing to participate in a screening on June 29, 2016.

Goss testified that in July 2015, respondent-mother was referred to Michigan Works to obtain employment. In October or November 2015, she got a job and was working 30 to 40 hours each week. With respondent-father's SSDI benefits, the combined household monthly income was $1,400. Respondents missed parenting time, stating that they were working at a carnival, but did not provide any proof that they had made money in doing so. Respondents were unable to maintain adequate housing. They were evicted from their home in October 2015 and were homeless through February 2016. Respondents stayed with friends and then received housing assistance while they were staying in a hotel in January and February 2016. Respondents reported that they were current on their rent ($625 per month); however, respondents' landlord had told Goss that he was seeking to evict respondents by July 17, 2016.

Goss opined that respondents had not adequately addressed the issues that had led to the court's involvement. She noted that they continued to struggle with substance abuse, housing and parenting, and had not acknowledged their problems. Goss also opined that it was in the children's best interests to terminate respondents' parental rights because the children needed safety, structure and stability. Goss reported that AW2 was thriving in foster care because she was in a structured environment with caregivers who followed through with doctor appointments, therapy and education services. She had benefitted from her therapy treatment and no longer required behavioral medication. She was happy that she was able to finish an entire school year without moving, and was already looking forward to going back to school. AW1 had more issues to address than did AW2, and had been placed at the St. Vincent Residential Home in Lansing. AW1 had just begun therapy and had maintained a relationship with AW2's foster mother with daily phone calls and monthly visits. When asked whether the children were adoptable, Goss testified, "[AW2], I would consider yes. [AW1], we still have yet to see what's going to happen with her." Goss stated that AW2's foster mother wanted to adopt both children.

NW had been expelled from school and was involved in delinquency proceedings while he was in respondents' home. JC was truant from school while in respondents' care. NW had recently gone "AWOL" from the Michigan Youth Challenge Academy, after being placed there for less than one week, but was located and placed in a foster home. Respondents had assisted in locating NW. NW had told Goss that he wanted to remain in his current foster home but was also considering independent living.

Glenn Addis, the assigned case monitor for AW1, NW and JC, testified that it was unlikely that respondents would change their lifestyle given the family's CPS history and that they had not benefited from recent services. He noted that the children had been exposed to a chaotic anti-social lifestyle of doing whatever they desired, that respondent-mother got angry and made threats against the foster mother at a family team meeting and had to be physically removed from the premises, that respondents had been late for every visitation with AW1, and that during supervised parenting time respondents did not parent or monitor the children's behavior and behaved more like a friend than parents. Addis submitted the results of respondent-mother's most recent drug screen, which showed that she was within therapeutic limits for hydrocodone for which she had a prescription.

Respondent-mother testified that she had complied with her treatment plan. She thought that she and respondent-father were making progress because Goss had told them that she was happy that they were making progress, but she admitted that the court had determined at the previous six review hearings that she was not making progress. She claimed that Goss had recently said that she was satisfied with the home based on the Wraparound worker's report. She admitted to testing positive for narcotics without a prescription, including Tramadol, but explained that sometimes screens were considered positive because she did not provide proof of her prescription. She stated that she suffered from several herniated discs and degenerative disc disease, that she was delaying neck and lower back surgery as long as possible because of her age, and that she had obtained a referral for physical therapy on her own, although she had not yet begun therapy. Respondent-mother stated that she refused to do a drug screen in June 2016 because she had been told that her parental rights would be terminated no matter what she did.

Respondent-mother acknowledged missing some sessions with Catholic Human Services, citing job training, a cousin's death, and a flat tire. She testified that she stopped attending sessions after she was told at a June 2016 family team meeting that there was nothing she could do to prevent termination of her parental rights.

Respondent-mother admitted that she was behind on rent and electricity bills. She denied receipt of an eviction notice and claimed to be working things out with her landlord, who had contacted petitioner in the hope of getting some payment assistance. She earned $300 every two weeks by working at a convenience store and reported that $253 was taken from her pay for child support. Respondent-father received $659 per month in SSDI benefits. Respondent-mother admitted to buying cigarettes with money that she could have used for rent or transportation.

Respondent-mother believed that she had benefited from the parenting program in that she had learned how to recognize a child's behavior as a reaction to trauma rather than as

rebelliousness. She had followed the recommendation of parental guidance counseling, felt that she had benefited, and claimed that she wanted to continue but that petitioner had refused to pay for further services. She stated that she had missed most of the children's medication reviews because 90% of them were held in the afternoon during her work shift. She could not explain why she had missed appointments before she began her job on November 17, 2015.

On September 7, 2016, the trial court issued an opinion and order finding that there was sufficient evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*) and (g) because they had failed to benefit from offered services. The court noted that respondents were unable to provide proper care for the children due to continued illegal drug use, inappropriate parenting skills and inadequate housing. The court also determined that it was in the children's best interests to terminate respondents' parental rights because they were unable to provide the children with a stable home environment and the twins would be available for adoption. The court concluded that it was not in NW's best interests to terminate respondents' parental rights to him because he was 16 years old and had no prospects for adoption and would likely become an adult before an adoption could be finalized. Also, NW was residing with JC in their maternal grandmother's home.

## II. DOCKET NO. 335146

Respondent-father claims that the trial court erred during the adjudication phase of the proceedings by accepting his plea of admission. Respondent-father's argument is an impermissible collateral attack on the order of adjudication. See *In re Kanjia*, 308 Mich App 660, 667; 866 NW2d 862, 867 (2014); *In re SLH*, 277 Mich App 662, 668; 747 NW2d 547 (2008); *In re Hatcher*, 443 Mich 426, 444; 505 NW2d 834 (1993). Although respondent-father was not represented by counsel when he made his plea of admission, he provided the referee with a written waiver of counsel, indicated that he was aware that he was waiving his right to an attorney, admitted to certain specific allegations in the petition, indicated that he understood that by his admissions he was giving up his rights attendant to an adjudication trial, and reiterated his admissions and the voluntary nature of those admissions. Respondent-father was represented by an attorney from May 29, 2015 through the filing of the supplemental petition and termination hearing, yet made no attempt to take a direct appeal from the order of adjudication. We therefore decline to address this argument. See *Hatcher*, 443 Mich at 444.

Respondent-father next argues that there was insufficient evidence to support the statutory grounds for terminating his parental rights under MCL 712A.19b(3)(c)(*i*) and (g). We disagree. We review for clear error an order terminating parental rights, *In re Rood*, 483 Mich 73, 90-91, 126 n 1; 763 NW2d 587 (2009); MCR 3.977(K). To be clearly erroneous, a decision must be more than maybe or probably wrong. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). Clear error exists "if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

MCL 712A.19b(3)(c)(*i*) and (g) provide:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The record shows that respondent-father did not adequately address his substance abuse issues or achieve sobriety, lacked appropriate parenting skills, and was unable to provide the children with proper care or custody. Apart from the extensive CPS history in this case and the fact that at one point respondent-father had not seen the children for approximately five years, at the October 2014 disposition respondent-father was ordered to comply with and benefit from his case treatment plan with the goal of acquiring emotional stability, particularly through sobriety, appropriate parenting skills, suitable housing, and financial stability. Between the May 2015 removal and the July 2016 termination hearing, respondent-father was provided with extensive services. The proofs showed that respondent-father failed to substantially comply with and benefit from his treatment plan. Failure to comply with a treatment plan is evidence of continued neglect. *In re Trejo*, 462 Mich 341341, 360; 612 NW2d 407 (2000). Although respondent-father made some progress in early 2015, he made only minimal progress after July 2015. Respondent-father did not participate in services for several weeks because he allegedly went to work for a travelling carnival, but he had no proof that he had earned an income from this endeavor. Respondent-father never demonstrated any noticeable period of abstention from drugs. He failed 26 of 29 drug screens between July 2015 and May 2016. He did not follow through with a September 2014 substance abuse assessment until February 2016. According to his substance abuse assessment, he was to attend physical therapy to help him with alternative pain management, along with individual and group therapy to address his drug addiction; yet respondent-father never complied with any of these recommendations. In March 2016, he admitted that he had an opiate addiction but refused in-patient treatment, choosing outpatient methadone treatment. There was no evidence that he actually participated in such treatment.

Further, respondent-father continued to struggle with parenting, housing and financial management at the time of termination. Although he completed a parenting program, supervised parenting time was chaotic. Caseworkers had to intervene because respondents were unable or unwilling to properly engage the children and monitor their behavior. A caseworker testified that respondents acted more like friends than parents. Respondent-father refused to take the children to 20 critical medication review appointments, despite being provided with transportation assistance. He did not cooperate and keep appointments with caseworkers.

Moreover, respondent-father was homeless from October 2015 to February 2016. At the time of the termination hearing, he was in arrears on rent and his landlord had reported that he was initiating eviction proceedings. Respondent-father was unable to appropriately manage his SSDI benefits. Clearly, the conditions that led to the court's intervention continued to exist. Two caseworkers testified that there was no reasonable likelihood that respondent-father would achieve sobriety and acquire appropriate parenting skills within a reasonable time considering the children's ages. Therefore, there was sufficient evidence to support termination of parental rights under MCL 712A.19b(3)(c)(*i*).

These proofs similarly showed that respondent-father, without regard to intent, failed to provide proper care or custody for the children and that there was no reasonable expectation that he would be able to provide proper care and custody within a reasonable time considering the children's ages. Accordingly, the evidence was also sufficient to terminate under MCL 712A.19b(3)(g).

### III. DOCKET NOS. 335145 & 335146

Both respondents argue that termination of parental rights was not in the best interests of the twins. We disagree. We review for clear error a trial court's best-interest determination. *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003); MCR 3.977(K).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App at 40; 823 NW2d 144 (2012). The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id*. at 41-42. It may also consider the likelihood that the child could be returned to the parent's home in the foreseeable future, and compliance with the case service plan, *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012), as well as evidence that the child is not safe with the parent, *In re VanDalen*, 293 Mich App 120, 141; 809 NW2d 412 (2011). A best-interest determination must be supported by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

Respondents argue that it was unlikely that the twins would be adopted, and that the trial court erred by separating the twins from their older siblings. Respondents further argue that the best interest determinations regarding AW1 and AW2 were erroneous because the trial court concluded that it was not in NW's best interests to terminate respondents' parental rights. We disagree. The trial court properly considered the individual needs of each child. *Olive/Metts*, 297 Mich App at 42. The record shows that all of respondents' children had pervasive behavior disorders that would require extensive attention. But AW2 in particular was so unsocialized and out of control that she required residential treatment. And there was evidence of a substantial positive change in the behavior of AW1 and AW2 after placement in foster care. The caseworker testified that the children needed safety, structure and stability. AW1 was thriving in foster care because she was in a structured environment with caregivers who followed through with doctor appointments, therapy and education services. She had benefitted from all of her therapy treatment and no longer required behavioral medication. She was happy that she was

able to finish an entire school year without moving and was already looking forward to going back to school. However, she regressed to defiant behavior after visits from respondents. AW2 was receiving the services she needed in her therapeutic temporary residential placement. The case manager testified that she would return to the same foster home with her sister upon completion of the program. And although NW's prospects for adoption may have been slight considering his age, AW1's foster parents were interested in adopting both of the twins (who were 14 at the time of termination).[3] Two caseworkers opined that it was in the twins' best interests to terminate respondents' parental rights.

The twins' need for permanency, finality and stability, respondents' deficient parenting ability, and the advantages of a foster home over respondents' home all overwhelmingly favored termination of respondents' parental rights to the twins. *Olive/Metts*, 297 Mich App at 42. The record supports the trial court's determination, and we accordingly are not left with a definite and firm conviction that the trial court made a mistake in terminating respondents' parental rights to AW1 and AW2. *BZ*, 264 Mich App at 296-297.

Affirmed.

/s/ Jane E. Markey
/s/ Amy Ronayne Krause
/s/ Mark T. Boonstra

---

[3] NW was also placed with a maternal relative, a factor that weighs against termination. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010).